**Erwin G. HANSEN, Plaintiff,**

v.

**Herbert BROWNELL, Jr., Attorney General of the United States and Successor to the Alien Property Custodian, Defendant.**

Civ. A. No. 1584–53.

United States District Court
District of Columbia.

May 23, 1955.

Isidore Alk, Washington, D. C., for plaintiff.

Dallas S. Townsend, Asst. Atty. Gen., James D. Hill, Walter T. Nolte, Robert J. Wieferich & James H. Falloon, Asst. Attys. Gen., for defendant.

McGUIRE, District Judge.

The first matter that has to be disposed of is whether or not the property vested is actually the property of the plaintiff, because if it is not his then, of course, he has no right to proceed in the circumstances.

Plaintiff says that while the property was not ever manually delivered to him, yet he obtained it by gift from his father on January 15, 1934 by transfer presumably out of his father's name into his name in the deBary Bank in Amsterdam. This was his testimony at the trial. At the trial, however, he was confronted by documentary evidence in the nature of an admission against interest *ante litem motam* to the effect that the same was obtained by "purchase" in 1932. (Def.Ex. No. 1)

This lends itself to two conclusions. First: That the property is not his by virtue of either of the two versions of the method by which it was secured because they are mutually irreconcilable and exclusive, and certainly if the property is his he ought to be able to state categorically how he obtained it. Second: That it is his but that he became confused as he testified with the meaning of the word "purchase", assuming that in the circumstances in which it was used it had a legal connotation, or that he was aware of the meaning of the word, as he also said, but for reasons occult, unexpressed and best known to himself, he desired to leave the matter in

its present and ambiguous state, relying on the bank records to show title.

Be that as it may, however, assuming that the property was his in all aspects of title both legal and beneficial, the next question is whether or not he was an enemy alien within the terms of the Act on June 26, 1951 *even* though he was physically absent from Germany and living in Paris and regarded by the French Government as a British subject and carrying a British passport.

The seizure was made on June 26, 1951. On that date, even though actual hostilities had long since ceased, this country was still technically at war with Germany even though the Third Reich had ceased to exist, and that state of war continued until October 19, 1951 when the Congress by joint resolution declared that it no longer existed. That being so, technically at least the plaintiff was an enemy alien even though not resident in Germany on that date, although he resided in Germany from July 1939 to some time in April of 1948 and this during the period of actual hostilities. Not only that, he took a very active part in the furtherance of the German war effort by taking an active and important part in German propaganda by virtue of his mastery of the English language.

He says, however, that this activity of his was of a compulsive character because of the alternatives presented to him, (1) service in the German Army; (2) a concentration camp; or (3) making himself amenable to whatever work of a noncombatant character the authorities would order him to do. He claims that faced with these alternatives he chose "the least [sic] innocuous," but he *applied* for work with the Rundfunk. He testified that this work was most repulsive to him and there is some supporting evidence by way of exhibits that bears out this claim. However, the manager in charge of the station, one Horst Cleinow, now temporarily in this country and subject to deportation, who knew the plaintiff and under whom the plaintiff worked, testified that he knew of no such disposition upon his part nor was any inquiry at any time ever made of him in his capacity as the official in charge as to his status and as to his reluctance, as he states, to do the work in question.

This being so, certainly he bears enemy taint. He was physically present within the country. Not only that, but he actively participated in work now generally regarded of prime importance in war, namely, that of propaganda. He was an announcer, took part in skits, and actually prepared some; and in counterbalance to his claim that this was under duress or compulsion he received a salary larger in proportion than the other participants and certainly larger than that of the manager who testified against him. Certainly there could be no compulsion in the matter of preparing or authoring skits. This called for some creative talent which even the Rundfunk could not discover unless it had been manifested to it.

■ This being the view of the matter that the Court takes with reference to the evidential picture as it unfolded, it concludes (1) that the property was not his, and (2) even if it be concluded that it was, the greater and fatal disability comes into play because he was in fact an enemy alien of a country with which the United States of America was at war and not only in that status but an active participant in the prosecution of that war against this country. He further labors under an equally fatal disability in that he was also an officer, agent, or official of the German Reich during the war by virtue of the character and type of employment that was his, and within, as a consequence, the further inhibiting provisions of the Statute, 50 U.S.C.A.Appendix, § 2(b). The fact that he subsequently left Germany and went to France does not help him. Actual hostilities had ceased, it is true, but the war had not officially, and he was still an enemy alien. So that the effect of his conduct while a voluntary resident in Germany during hostilities is some-

thing that went with him no matter where he went during the time the war, though actually terminated, was still officially on. To conclude otherwise would lead to results both illogical and absurd.

Counsel will prepare tentative findings of fact and proper order.